June 23, 1977

## 77–40   MEMORANDUM OPINION FOR THE GENERAL COUNSEL, NUCLEAR REGULATORY COMMISSION

### Damage Claims Under the Atomic Energy Act

This is in response to your request for our opinion concerning the effect of a floor amendment proposed by Senator Hathaway (Hathaway Amendment), and included in the Act of December 31, 1975, Pub. L. 94–197, 89 Stat. 1111 (1975 Act), amending the Atomic Energy Act of 1954, as amended. The provisions of that Act involved here are known as the Price-Anderson Act, 71 Stat. 576 (Sept. 2, 1957), incorporated in sections 2, 11, 53, and 170 of the Atomic Energy Act, 42 U.S.C. §§ 2012(i), 2014(j)-(u), 2073(e)(8), 2210 (Act).

You suggest that the Hathaway Amendment should be read to eliminate all provisions of the Price-Anderson Act that allow the reasonable costs of investigation, settlement, and defense of damage claims (costs) resulting from a nuclear incident to be absorbed from the various sources of funds that the Act makes available. For the reasons given below, we believe that costs are properly excludable only from the Nuclear Regulatory Commission's (NRC) indemnity amount.

The Act establishes a complex scheme for meeting public liability claims arising out of accidents at nuclear reactor facilities. First, the Act limits the maximum aggregate liability for any single incident to $560 million. § 170(e); 42 U.S.C. § 2210(e) (Supp. V, 1975). Second, the Act requires each licensee to maintain "financial protection," usually insurance, in an amount determined by the NRC, currently $125 million. Third, the Act provides that for awards in excess of the "financial protection" coverage up to the aggregate liability limit described above, the NRC will indemnify the licensee for the excess over the "financial protection" coverage. § 170(c); 42 U.S.C. § 2210(c) (Supp. V, 1975). Because the maximum aggregate liability is $560 million, and the currently required financial protection is $125 million, the maximum indemnity presently payable by the NRC is $435 million.

The Price-Anderson Act was extended and amended by the 1975 Act. The 1975 Act provides for the establishment of a deferred premi-

um scheme that, over the course of time, will replace the NRC indemnity with one funded by the nuclear power industry.[1] Thus, when the 1975 Act is implemented, the funds available for paying public liability claims will be composed of (1) "financial protection" (insurance); (2) the deferred premium insurance scheme; and (3) the NRC indemnity. On the floor of the Senate, Senator Hathaway introduced an amendment to the 1975 Act that provided, with respect to the NRC indemnity, that costs were to be excluded in calculating the indemnity amount. Prior to this, the Act clearly provided that the costs of investigating, settling, and defending claims were included in the amount charged against the maximum liability—$560 million. No amendment was proposed expressly to exclude costs from the amount required to be covered by the financial protection provided by licensees and, indeed, the previous statutory language expressly including such costs was reenacted in the 1975 Act. Further, the provisions of the 1975 Act that added the deferred premium scheme to the Act, expressly included costs within the sum to be made up by deferred premium payments. Finally, no amendment was proposed to exclude costs from the maximum liability limits established under the Act. The Hathaway Amendment was adopted by the Senate and enacted into law.[2]

The literal result of the Hathaway Amendment is to provide that costs are to be excluded from that part of the maximum aggregate liability payable by the NRC and included for purposes of the financial protection and deferred premium plans. Thus, as the NRC's exposure declines as the deferred premium plan assumes a greater part of the exposure, the aggregate amount payable to the public will decline, because a greater portion of the amounts available within the aggregate liability limitation will be exposed to the payment of costs, which, as a result of the Hathaway Amendment, are not included in that portion of the aggregate liability limitation attributable to the NRC indemnity.

Although the words of the Hathaway Amendment changed the treatment of "costs" only with respect to the NRC indemnity, Senator Hathaway may well have intended this change to apply to all elements of the Act. In introducing his amendment, he described it as follows:

> Quite simply, what this amendment does is to require that the entire resources of the $560 million fund—or whatever limit is established through the retrospective premium system—be used only for the purpose of compensating people who are injured or sustain damages as a result of a nuclear accident. It amends several

---

[1] Under the deferred premium scheme, in the event of a nuclear accident that exhausts the licensees' financial protection coverage, all licensees will, in effect, be assessed up to $5 million per facility as the deferred premium feature of the 1975 Act takes effect. § 170(b) of the Act; 42 U.S.C. § 2210(b) (Supp. V, 1975).

[2] The amendment itself amended, *inter alia,* five sections of the Act: § 170(c), 42 U.S.C. § 2210(c) (Supp. V, 1975); § 170(d), 42 U.S.C. § 2210(d) (Supp. V, 1975); § 170(h), 42 U.S.C. § 2210(h) (Supp. V, 1975); § 170(k), 42 U.S.C. § 2210(k) (Supp. V, 1975); and § 170(l), 42 U.S.C. § 2210(l) (Supp. V, 1975).

provisions of the Price-Anderson Act which at present permit the payment of investigative costs, settlement fees, and defense costs out of the overall liability limit. My amendment specifically excludes these costs from any determination as to when the overall liability limitation has been reached. 121 Cong. Rec. S. 40966 (1975).

However, in a later colloquy with Senator Baker, the comanager of the bill, Senator Hathaway indicated that his amendment was not intended to change the existing practice of including costs within the amounts to be provided by financial protection (insurance).[3]

It is difficult to reconcile the inconsistency between Senator Hathaway's statements about what he intended. An intent to exclude costs entirely from the liability limit is incompatible with including them in one of the three elements of that limit. In addition, the intent to exclude costs is incompatible with the pre-1975 language of § 170(e), which expressly included reasonable costs in the limit on liability. Yet the same language was reenacted by the very bill to which Senator Hathaway's proposal was directed. § 170(e) of the Act. *See also* 121 Cong. Rec. 40959 (1975). If Congress desired to require that costs might not be deducted from the limit on liability, it had only to strike from § 170(e) the language that authorized such deduction; instead, the same authorization was included in the revised § 170(e), which Senator Hathaway did not amend.

Still a third inconsistency is evident. The deferred premium scheme, the heart of the 1975 revision of the Price-Anderson Act, makes costs an element of the premiums themselves. Act, § 170(b). *See also* 121 Cong. Rec. 40958-9 (1975). As with revised § 170(e), this language, too, was included in the bill both before and after adoption of the Hathaway Amendment. Finally, the 1975 extension continues in effect the existing definition of "financial protection," specifically including the costs of investigation, settlement, and defense of claims. Act § 11(k); 42 U.S.C. § 2014(k).

Whatever may have been Senator Hathaway's intention, Congress went forward and enacted the bill expressly excluding costs from the indemnity provision (as per the Hathaway Amendment) and expressly including costs in the deferred premium and financial protection provisions. Thus, even were it clear that the subjective congressional intent was to completely eliminate costs, it is unmistakably clear that its objective manifestation and the language chosen was insufficient to achieve the intended result; "legislative intention, without more, is not legislation" *Train* v. *City of New York*, 420 U.S. 35, 45 (1975). As the Supreme Court noted in that case, legislative action can simply be

---

[3] Mr. Baker: "The cost of the investigation ordinarily is charged against the insurance before it ever gets to the indemnity side. Is there anything in your [amendment] that changes that relationship?"

Mr. Hathaway: "No." 121 Cong. Rec. 40967 (1975).

159

"inadequate" to its ends *id.* at 44, and, in our view, that is the case here, as the following review of the principles of statutory construction indicates.

The language of a statute is the prime indicator of legislative intent. Chief Justice Marshall, in one of his earliest opinions, said that a "law is the best expositor of itself" *Pennington* v. *Coxe,* 6 U.S. (2 Cranch) 33, 52 (1804), a rule that he stated more completely in *The Paulina* v. *United States,* 11 U.S. (7 Cranch) 52, 60 (1812):

> In construing [a statute] it has been truly stated to be the duty of the court to effect[uate] the intention of the legislature; but this intention is to be searched for in the words which the legislature has employed to convey it.

*Accord, United States* v. *Wiltberger,* 18 U.S. (5 Wheat.) 76, 94–95 (1820) (Marshall, C. J.). The rule no more than states the obvious. In interpreting a statute one must first look to the language that Congress employed. *E.g., Flora* v. *United States,* 357 U.S. 63, 65 (1958); *A. Magnano Co.* v. *Hamilton,* 292 U.S. 40, 46–47 (1934); *United States* v. *Standard Brewery,* 251 U.S. 210, 217 (1920); *United States* v. *Union Pacific R. Co.,* 91 U.S. 72, 79 (1875).

> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. *United States* v. *American Trucking Ass'ns Inc.,* 310 U.S. 534, 543 (1940).

This is not to say that other meanings may not be attributed to ambiguous or contradictory statutory phrases. Where that is the case, resort to the rules of construction or to implications which may be found in legislative history are of course appropriate. But "[w]ords used in a statute are to be given their ordinary meaning in the absence of persuasive reasons to the contrary. . . ." *Burns* v. *Alcala,* 420 U.S. 572, 580–81 (1975).

Applying this rule, we note that the language of the revised Price-Anderson Act is clear and unambiguous concerning "costs" and the limit on liability; § 170(e) of the amended Act includes costs within that limit in unmistakable terms. To impose a contrary interpretation on the Act, despite the words of § 170(e), would amount to a finding that the section has been amended by necessary implication from the indemnity portions of the Act that were more directly changed by Senator Hathaway's amendments. Repeal and amendments by implication are strongly disfavored. *Amell* v. *United States,* 384 U.S. 158, 165–166 (1966); *Silver* v. *New York Stock Exchange,* 373 U.S. 341, 357 (1963); *Mercantile Nat. Bank* v. *Langdeau,* 371 U.S. 555, 565 (1963); *United States* v. *Borden Co.,* 308 U.S. 188, 198–99 (1939). A new statute will not be treated as amending portions of an older one, not mentioned in

the former, unless there is a positive repugnancy between the two, *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 134 (1974), and it cannot be suggested that the various provisions of the revised Price-Anderson Act cannot be harmonized. We find no irreconcilable inconsistencies or absurdities of result if the Act be taken on its face and given its open and obvious meaning.

It is a "well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger* v. *Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633 (1973); *Jarecki* v. *G. D. Searle & Co.,* 367 U.S. 303, 307–308 (1961); *D. Ginsberg & Sons, Inc.* v. *Popkin,* 285 U.S. 204, 208 (1932). To accept your view of the revised Price-Anderson Act would mean that not only would such sections of its text as, for example, the definition of "financial protection," be given no force, but that many of its provisions must be read directly contrary to their terms. Where the statute sets an upper limit on all public liability from a nuclear incident, we would see only a limit on payments to claimants, disregarding all costs.

So drastic a reversal of the ordinary meaning of the statutory language cannot be supported by the meager evidence of a single statement by the proponent of an amendment, itself at odds with his later words and the terms of his amendment. We have been unable to discover in the legislative record any showing of a congressional—as distinct from individual—purpose to change the inclusion of costs within the limit on liability. Upon the available record, we simply cannot conclude that Congress, by accepting Senator Hathaway's amendment concerning the treatment of costs under the Governmental indemnity, intended to make a similar change in their separate treatment under the limit on public liability.[4]

Nor do we find support for the view that costs are now excluded from financial protection insurance and deferred-premium payments, despite the explicit statutory language that includes costs in those amounts. It could not be contended, for example, that the inclusion of costs in financial protection insurance was an obscure or hidden matter. It is evident on a single reading of the definition of "financial protection," § 11(k), 42 U.S.C. § 2014(k), and is accepted by insurers, licensees, and the Commission alike. Reenactment of a statute that has acquired a settled significance ordinarily adopts that meaning in the absence of a plain indication to the contrary. *Heald* v. *District of Columbia,* 254 U.S. 20, 23 (1920). We should point out that with respect to financial protection, even Senator Hathaway's own intent is ambiguous. His reply to Senator Baker, *supra,* denies any purpose to alter the existing relationship between indemnity and financial protection, in

[4]You suggest that the trade press and certain staff members of the Joint Committee on Atomic Energy understood the Hathaway Amendment to exclude costs from all parts of the Price-Anderson scheme. Such "sources" for determining legislative intent hardly suffice to enable one to decide that when Congress used the word "including" it really meant "excluding."

which "costs" were subtracted from that insurance coverage before the indemnity could be reached.

Thus, we find no basis for concluding that Congress has altered the meaning of § 11(k)—including costs as an element of the term "financial protection"—or that Congress intended to abrogate existing insurance contracts that, we understand, similarly provide that the insurer's liability for costs and claims is limited to the required amount of financial protection.

We are likewise unable to conclude that the 1975 revision to the Price-Anderson Act has mandated an exclusion of costs from the deferred-premium element of its system. To do so would be to contradict the explicit language of § 3 of the 1975 Act. Section 3 expressly includes costs in ascertaining the amount of deferred premiums against nuclear licensees.

It is suggested that somehow the Supreme Court's recent decision in *Train* v. *Colorado Public Interest Research Group, Inc.*, 426 U.S. 1 (1976), provides a basis for concluding that when Congress used the word "including" it intended the word "excluding." In that case, the Supreme Court held that the words "radioactive material" in the Federal Water Pollution Control Act did not include source, byproduct, or special nuclear materials, all of which were already regulated under the Atomic Energy Act, and that the courts could properly consider traditional legislative history materials in construing the words of a statute, even where the statutory words themselves may seem to be clear on superficial examination.[5] In that case, however, the House report, the Senate debates, and the conference report all indicated clearly that source, byproduct, and special nuclear materials were not intended to be within the statutory definition of "radioactive material." Thus, the available legislative materials in that case were substantially different from the inconsistent statements of Senator Hathaway here present. Moreover, a determination that "radioactive materials" does not mean "all radioactive materials," is substantially different from a determination that "including" means "excluding."

Finally, it is suggested that "policy" considerations support the view that the Hathaway Amendment should apply even to the unamended portions of the Act. The policy principle cited to support this view is that the licensee is to be responsible for providing financial protection to the public. Unfortunately, the Price-Anderson Act attempts to reconcile several conflicting policies, of which the principle noted above is only one. Others include providing protection to the public and a financial source from which damage awards may be paid, and the perceived need to protect the nuclear power industry from unlimited or "unaffordable" liability—a policy evidenced in the maximum liability limitations of the Act. That policy perhaps supports the view that, at least with respect to that portion of the maximum exposure that is the

[5] *Train, supra,* at 9–11, 24–25.

responsibility of the licensees, costs were intended to be included so that the maximum exposure could be determined with certainty.

In short, we conclude that the Price-Anderson Act, as amended, excludes the costs of investigation, settlement, and defense of claims under the remaining Federal indemnity. The 1975 revision of that Act did not change the treatment of those costs under either the overall limit on public liability arising from a single nuclear incident, the financial protection insurance required of licensees, or the industry-funded deferred-premium elements of the statutory compensation system.

JOHN M. HARMON
*Acting Assistant Attorney General*
*Office of Legal Counsel*